| | |
|---|---|
| LABORATORY CORPORATION OF AMERICA HOLDINGS and DIANON SYSTEMS, INC., | ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) 1:05CV00995 |
| | ) |
| G. BERRY SCHUMANN, M.D. and SCHUMANN CYTOLOGY LABORATORIES, INC., | ) ) ) |
| | ) |
| Defendants. | ) |

## ORDER AND RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

### I.  Facts and Claims

The central motion before the Court is defendants' motion to have the case dismissed or, in the alternative, transferred to the United States District Court for the District of Connecticut.[1] Defendants, a Connecticut resident and a Connecticut corporation with its principal place of business in Connecticut, contend that this Court does not have personal jurisdiction over them.  They also maintain that, even if jurisdiction is present, the interests of justice dictate that the case be transferred to the District of Connecticut pursuant to 28 U.S.C. § 1404(a).  Plaintiff Laboratory Corporation of America Holdings (LabCorp) is a Delaware corporation with its principal place of business in North Carolina, while plaintiff Dianon Systems, Inc. (Dianon) is a Delaware corporation

---

[1]Plaintiffs also have a pending motion to supplement their response to the motion to dismiss/transfer. Defendants do not oppose the granting of that motion other than to make a point that they disagree with one of the assertions in the supplement.  For this reason, and because defendants were allowed to supplement their own reply brief, plaintiffs' motion to supplement will be granted.

with its principal place of business in Connecticut. Dianon is a wholly-owned subsidiary of LabCorp. Plaintiffs believe that personal jurisdiction does exist and that this District is the proper venue for the case.

The parties before the Court are embroiled in what is essentially a trademark dispute that has its genesis more than thirteen years in the past. Both plaintiff Dianon and defendants claim to have been involved in the creation of the mark "MICROCYTE"[2], which is used in conjunction with a form of urinalysis testing and reporting.

Whoever created the MICROCYTE mark, it apparently originated in the 1992/1993 time frame. In 1993, Dianon signed a "Technical Service Agreement" (TSA) with defendant Schumann Cytology Laboratories, Inc. (SCL). That agreement stated that "SCL has technical knowledge and has developed a testing service (<u>Microcyte and Renalcyte</u>)." (Schumann Aff. Ex. A) The TSA generally obligated SCL to aid Dianon in using and performing the testing services and obligated Dianon to market and sell the services. Dianon was to compensate SCL through royalty payments for a five-year period, after which Dianon would have "a paid in full non-exclusive license in perpetuity." (<u>Id</u>.) For the five-year period, the license was apparently exclusive and non-transferable. The agreement was to be governed by Connecticut law.

---

[2]At some point in time two other related marks, "MICROCYTE II" and "MICROCYTE PLUS" were also developed. Together with the original MICROCYTE mark they will be referred to as "the MICROCYTE marks." The parties' dispute appears to involve all of the marks.

In addition to signing the TSA with SCL, Dianon also hired defendant G. Berry Schumann as an employee. Schumann is president of SCL, but also worked for Dianon in various capacities from 1993 until early 2005. He states in his affidavit that he always maintained control and approval over all aspects of the MICROCYTE testing standards, including accuracy and quality. (Id. ¶ 6)

In 2003, Dianon was purchased by LabCorp. As a part of this purchase, LabCorp assumed whatever interest Dianon had in the MICROCYTE marks. (Palmieri Decl. ¶¶ 5-6) Schumann continued his work for Dianon/LabCorp[3] after the purchase, but was eventually terminated in April of 2005. That termination is the subject of a wrongful termination suit filed by Schumann against Dianon in the state courts in Connecticut. (Schumann Aff. Ex. D.)

The claims raised by plaintiffs in this suit do not appear to be directly connected to the suit filed by Schumann in Connecticut. Instead, they relate mainly to the filing of an application made by SCL in the United States Patent and Trademark Office which seeks to register the MICROCYTE mark in connection with medical and diagnostic testing and reporting services, as well as instructional material and medical literature. The filing was made on March 4, 2005 and allegedly states that no one else has the right to use the mark in commerce.

---

[3]The exact identity of his employer is a matter of some debate between the parties, but, as will be seen, actually has no impact on the case.

Following the filing of the application, counsel for the parties exchanged letters, with each side asserting ownership of the MICROCYTE marks. Eventually, eleven days after Schumann's suit in Connecticut was filed, plaintiffs filed the present suit in this District. In their complaint, they raise the following claims (1) a claim for a declaratory judgment and injunction setting out and protecting their ownership rights in the MICROCYTE marks, (2) a claim under the Lanham Act alleging that defendants have engaged in business and advertising that has led to them providing materials that imitate or are derived from the MICROCYTE marks and falsely assert ownership over the marks, (3) a common law infringement of service mark claim, (4) a claim for unfair or deceptive trade practices under North Carolina law, and (5) a claim seeking cancellation of defendants' registration application. Plaintiffs seek a long list of relief which is generally geared toward having defendants have nothing more to do with the MICROCYTE marks and also having them pay damages to plaintiffs.

## II. Discussion

### A. Personal Jurisdiction

The primary basis for defendants' motion to dismiss or transfer is that personal jurisdiction is lacking in this District. They claim that neither they nor the facts giving rise to the allegations in the complaint have any real connection to the District so that jurisdiction exists.

It is undisputed that neither defendant is a resident of North Carolina. Still, personal jurisdiction over nonresidents exists

-4-

where state law and the Due Process Clause of Fourteenth Amendment of the United States Constitution allow for it.  ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 622-23 (4th Cir. 1997).  Here, the applicable state law would be North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4.  The parties have not presented arguments as to whether jurisdiction under that statute would be proper and the Court will not delve into the matter on its own because the statute has been construed to reach to the constitutional limits of due process.  Therefore, the analysis of state law collapses into the analysis of any constitutional issues. The Christian Science Board of Directors of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209 (4th Cir. 2001).  As for the Constitution, it allows for personal jurisdiction where defendants have sufficient minimum contacts with a forum so that the suit against them is not offensive to fair play and substantial justice.  International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).  The ultimate focus is on fairness.  Kulko v. Superior Court of California In and For the City and County of San Francisco, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978).

The extent of the contacts needed for jurisdiction depends heavily upon whether the claims asserted against a defendant relate to or arise out of the defendant's contacts with the forum state. If they do, a type of personal jurisdiction known as "specific jurisdiction" exists.  This type of jurisdiction is specific to the claims asserted in the lawsuit.  Where the claims do not arise out

-5-

of a defendant's contacts with the forum state, much more extensive contacts--"continuous and systematic" contacts--are required. First American First, Inc. v. National Ass'n of Bank Women, 802 F.2d 1511, 1516 (4th Cir. 1986)(citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414 nn. 8, 9, 104 S.Ct. 1868, 1872 nn. 8, 9, 80 L.Ed.2d 404 (1984)). These contacts must be of such a level that they are equivalent to physical presence in the forum state so that it would be fair to hale a defendant into court in the forum based on any claim raised against the defendant no matter where the facts underlying the claim arose. Purdue Research Foundation v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 787 (7th Cir. 2003); Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000). Plaintiffs claim that both types of jurisdiction are present.

Plaintiffs' initial argument is that the Court has specific jurisdiction over defendants. Specific jurisdiction is based on the idea that where a defendant has "purposefully directed" his activities into a forum state he has "fair warning" that litigation resulting from those activities could occur in that state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Because of the concept of purposeful direction, the Court will only look to activities "actually generated by the defendant" and not "'[t]he unilateral activity of those who claim some relationship with a nonresident defendant.'" Chung v. NANA Development Corp., 783 F.2d 1124, 1127 (4th Cir.

-6-

1986)(quoting <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 298, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)).

In support of this contention, defendants point to several contacts which they claim defendants have had with North Carolina and which led to or relate to the claims made in this lawsuit. These are that: (1) defendants sent letters to LabCorp in North Carolina concerning the ownership of the contested marks, (2) Schumann is a former employee of LabCorp who worked directly with the MICROCYTE testing program and received paychecks from North Carolina, (3) defendants benefitted from Schumann's employment with LabCorp and the associated use of the mark by plaintiffs in commerce in North Carolina, (4) defendants benefitted from MICROCYTE tests performed for North Carolina patients and many of the tests were conducted by Schumann himself, and (5) defendants sought to have plaintiffs expand the use of MICROCYTE tests in North Carolina. The Court will address each of these items in turn.

The first contacts with North Carolina listed by plaintiffs, letters sent to LabCorp regarding the MICROCYTE marks were certainly directed here by defendants and they relate to the causes of action set out by plaintiffs. However, the letters do nothing more than ask Dianon to comply with the MICROCYTE license as defendants view it. (Schumann Aff. Exs. B and C; Taulbee Decl. Exs. A and B)  Initially, it should be noted that all of these letters were sent to North Carolina either at plaintiffs' request or in response to questions by plaintiffs' attorneys. (<u>Id</u>. and

-7-

Schumann Aff. ¶ 9)  Therefore, it is questionable whether the letters should even be considered unilateral acts aimed at this State by defendants.

Even if the letters are considered to be acts initiated by defendants, these sorts of letters, which are routine in patent and trademark cases, are not enough by themselves to allow for jurisdiction.  <u>Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.</u>, 148 F.3d 1355, 1360 (Fed. Cir. 1998).  This is because basic fairness requires that a party be able to inform another party of an alleged dispute without subjecting itself to jurisdiction in a far away forum.  <u>Id</u>. at 1361.  To hold otherwise would leave a party with the unpleasant task of choosing between ignoring what it believes are violations of its patent or trademark, filing suit without attempting to work the matter out, or trying to work the matter out and thereby subjecting itself to jurisdiction in another state.  Plaintiffs cite no contrary case law.  Therefore, the Court does not consider the letters to be the type of minimum contacts that can create jurisdiction over defendants.

The next contacts pointed to by plaintiffs are that Schumann was an employee of LabCorp, that he worked with the MICROCYTE program while he was an employee, and that his paychecks were sent from a North Carolina bank.  This argument has at least three significant problems.  The first is plaintiffs' complaint specifically alleges that Schumann was an employee of Dianon. (Complaint ¶ 16)  While it has submitted some evidence that he was a LabCorp employee from 2003 until 2005, it recently repeated the

allegation that he was a Dianon employee in a filing with the United States Patent and Trademark Office. (Def. Supp. to Reply Brf. Ex. 1 ¶ 11) Plaintiffs' unexplained, but apparent, desire to have it both ways has led to considerable confusion in the case. However, because the issue is mooted by the following two points, the Court will assume for the sake of argument that Schumann was an employee of LabCorp.

A more important difficulty for plaintiffs' use of Schumann's purported employment with LabCorp is that it was created, if at all, by plaintiffs' unilateral activities when Dianon was bought by LabCorp. The same is true for the bank that Schumann was paid from and the duties of his employment. These were determined by plaintiffs. Plaintiffs claim that Schumann should be held responsible for his employment with LabCorp because he chose to remain at his job. Plaintiffs cite no case law to support the proposition that, when an employer is bought by an out-of-state corporation, employees must either quit their jobs or be subjected to jurisdiction in the home state of the purchasing corporation and the state where the bank they are paid from is located. They have also not explained how this would comport with the basic concepts of fairness.

Finally, it does not appear that the alleged North Carolina connections with Schumann's job relate to the claims raised in the case. In arguing that they do, plaintiffs construct a faulty syllogism. They state that defendants' claims to the MICROCYTE marks arise from or relate to Schumann's employment with plaintiffs

and that certain aspects of Schumann's employment involved connections to North Carolina. From these two supportable statements they then conclude that there is a connection between Schumann's North Carolina contacts and the claims in the case. However, this conclusion is incorrect. Both defendants and Dianon's alleged ownerships of the MICROCYTE marks appear based on events in the 1992/1993 time period and defendants' creation of the licensing agreement with Dianon–events occurring a decade before LabCorp entered the picture. LabCorp's ownership of the marks, if it exists, is derivative of Dianon's and it stands in Dianon's shoes. See generally duPont de-Bie v. Vrendenburgh, 490 F.2d 1057, 1061 (4th Cir. 1974)(assignees generally have the rights of the assignor). Plaintiffs' claims in no way arise from or relate to Schumann's paychecks from LabCorp or the bank that issued them.

Plaintiffs next point to MICROCYTE tests performed for North Carolina patients and note that Schumann personally performed many of these tests. (Kyle Decl. and Exs.) Plaintiffs' reliance on the tests falters for many of the same reasons just discussed. First, there is no indication that the use of the tests for North Carolina patients was directed or controlled by defendants. It is true that from 1996 to 1998 tests from North Carolina were performed and defendants would have received royalties based on the tests under the TSA. However, plaintiffs cite to no evidence showing that defendants, as opposed to plaintiffs, marketed or sold the tests in North Carolina so that the use of the tests in North Carolina can be fairly attributed to defendants. Again, activity by plaintiffs

-10-

cannot establish jurisdiction over defendants. Chung, supra. More specifically, royalty payments from a license do not constitute purposefully directed activity within a state where the licensee chooses to do business. Red Wing, 148 F.3d at 1361.

As for Schumann's performance of the actual tests, this occurred in his capacity as an employee of one or both of plaintiffs while he worked in Connecticut. Plaintiffs also do not show that Schumann's performance of the tests creates or relates to the claims raised in the complaint. His performance of the tests, particularly from 1996-2005, is simply not an issue in the case as it has been presented thus far.[4]

Finally, plaintiffs have produced evidence that defendants sought to expand the use of the MICROCYTE marks in North Carolina by encouraging more extensive use of the tests in the state. Defendants sought to have the test become the standard test in North Carolina, Connecticut, and Oklahoma and offered to assist the plaintiffs by "bridg[ing] the technology gap between Connecticut and North Carolina" in return for a payment of $95,000 to SCL. (Palmeri Aff. Ex. A)

The letter has many of the attributes missing from plaintiffs' previous evidence. It shows an attempt by defendants, acting for themselves and not as an employee of plaintiffs, to aggressively

---

[4]Plaintiffs state that the tests resulted in a substantial number of test reports bearing MICROCYTE marks being sent to North Carolina and that these reports may have created confusion over ownership of the contested marks in North Carolina. Again, the reports were sent by plaintiffs or, at most, by Schumann acting pursuant to his duties as plaintiffs' employee. The introduction of the reports to North Carolina is an act of plaintiffs, not Schumann.

market the MICROCYTE mark in this state, to play an active part in
that marketing, and to realize a direct pecuniary benefit from
those activities. In these respects, it serves as an example of
what most of plaintiffs' evidence to this point has lacked.
However, it still does not establish jurisdiction because the
proposal was not accepted. Thus, defendants hoped for the type of
contact with North Carolina that might have subjected them to
jurisdiction here, but that contact did not occur.[5] Plaintiffs do
not explain how jurisdiction can be based on an unrealized proposal
or cite case law showing that a rejected offer to do business
creates jurisdiction.[6]

Overall, plaintiffs have failed to establish jurisdiction
because their evidence consists mainly of their own activities,
actions that Schumann engaged in while under their direction,
and/or actions unrelated to the claims before the Court. The only
notable exception, letters asserting ownership of the MICROCYTE
marks, which were sent to LabCorp in North Carolina by defendants,
are not enough to establish jurisdiction by themselves. See Red
Wing Shoe, supra. Plaintiffs' attempt at establishing specific
jurisdiction fails.

_____

[5]The Court intentionally uses the phrase "might have subjected them to
jurisdiction" because it is still not entirely clear that the activities, had
they occurred, would directly relate to the claims raised in plaintiffs'
complaint.

[6]It is also worth noting that the proposal was delivered by Schumann to one
of plaintiffs' executives at her office in Connecticut. He did not mail it to
North Carolina, travel to North Carolina, or speak with anyone in North Carolina
about the proposal. (Second Schumann Aff. ¶ 3)

-12-

The Court now turns from plaintiffs' evidence of specific jurisdiction to examine their evidence demonstrating general jurisdiction. Little examination is needed because the evidence falls woefully short of its intended mark. To establish general jurisdiction, plaintiffs again point to the fact that Schumann was paid from a North Carolina bank account during part of his employment with plaintiffs. They also submit LabCorp forms he signed as part of his employment and a letter that he sent to LabCorp regarding his termination. (Holmes Decl. and Exs.) Finally, they point to his publication of books and articles that can be found in several North Carolina academic libraries. (Bayzle Decl.)[7]

As set out previously, general jurisdiction does not exist unless defendants' contacts with this State are so extensive, systematic, and continuous that they approximate physical presence. Helicopteros Nacionales, 466 U.S. at 414 nn. 8, 9, 104 S.Ct. at 1872 nn. 8, 9; Bancroft & Masters, 223 F.3d at 1086. The issuance of Schumann's paychecks from a bank in this state are not such contacts because the location the checks were issued from was the choice of plaintiffs, not Schumann. This was plaintiffs' activity, not his.

Even if the issuance of the checks were somehow attributed to Schumann, it would amount to little. Plaintiffs cite to the case of Precept Medical Products, Inc. v. Klus, 282 F. Supp. 2d 381,

---

[7]All of this evidence relates only to Schumann. Plaintiffs make no general jurisdiction argument as to SCL.

383-384 (W.D.N.C. 2003), for the proposition that receipt of checks from a forum can be considered when determining jurisdiction. In doing so, plaintiffs ignore the fact that <u>Precept</u> is a specific, not general, jurisdiction case and, more importantly, that the checks discussed in <u>Precept</u> were sent as a result of an ongoing business relationship that the defendant in that case created and maintained. As a part of the relationship, he sold products in North Carolina, submitted the orders to an office in North Carolina, and then accepted commission checks from North Carolina <u>Id</u>. at 385. Naturally, the checks were considered as a part of the analysis of the purposeful and ongoing relationship.

Schumann's receipt of the checks in the present case is far different. Schumann was employed by Dianon in Connecticut for several years before it was bought by LabCorp. He did nothing more than continue to hold his job and perform his duties, as set by plaintiffs, in Connecticut. There is no evidence that he asked to be paid from North Carolina. Likely, as with most employees, he cared only about the sufficiency of the account he was paid from, not its location. The routine receipt of an out-of-state paycheck is not the sort of purposeful contact that will establish general jurisdiction.

Employment forms Schumann filled out, the letters regarding his termination, and the fact that his publications are available here add nothing. The forms were filled out at Dianon's behest so that he could continue working in Connecticut. (Schuman Aff. ¶ 2) The letters were sent to LabCorp in North Carolina at Dianon's

-14-

direction.  (<u>Id</u>.)  Finally, the books and articles were sold and shipped here by their publishers.  While Schumann may have benefitted indirectly, he states that he never instructed the publishers to send items here and that he has no control over them doing so.  (<u>Id</u>. ¶ 4)  Plaintiffs do not show otherwise.[8]  Even considering all of plaintiffs' proffered contacts together, they fall far short of continuous and systematic contacts necessary for general jurisdiction.[9]  Their case can be dismissed on this basis.

### B. Transfer

Even though dismissal for lack of personal jurisdiction is an available outcome in this case, it is not the Court's only option. Defendants have made an alternative motion to transfer the case to the District of Connecticut.  Additionally, the Court has the power to do so instead of dismissing the case if the case could have originally been brought in Connecticut.  <u>Chung</u>, 783 F.2d at 1130(remanding for consideration of transfer after finding no personal jurisdiction).  Inexplicably, plaintiffs do not indicate

---

[8]Plaintiffs also cite no authority stating that the fact that a person authors a work that is later published and sent to a state would create general jurisdiction over the author in that state, as opposed to specific jurisdiction for claims related to the publication itself.  The Court rejects the idea that it might.  To hold otherwise would subject many authors to jurisdiction in all states for any claim.  This would greatly broaden the concept of personal jurisdiction and would run afoul of any known concept of fairness.

[9]The inadequacy of plaintiffs' evidence regarding general jurisdiction is demonstrated by the case of <u>Helicopteros Nacionales de Colombia v. Hall</u>, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).  There, general jurisdiction did not exist in Texas even when a corporation purchased helicopters, equipment, and training services in Texas, sent its chief executive there for negotiations, sent personnel there for training, and accepted checks drawn on a Texas bank.  <u>Id</u>. at 416-18, 104 S.Ct. at 1873-74.  Those contacts were far greater than defendants' contacts in the present case.

whether they would prefer dismissal as opposed to a transfer. The Court will assume that plaintiffs would prefer a transfer. Moreover, even if the Court were to assume that it had jurisdiction over defendants, the basis for such jurisdiction would be sufficiently tenuous so that in evaluating the traditional factors, the Court would find that the interest of justice favors transferring this case to the District of Connecticut.

Typically, in considering a motion to transfer, the Court considers the following factors:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws." Plant Genetic Sys., N.V. v. Ciba Seeds, 933 F. Supp. 519, 527 (M.D.N.C. 1996)(citing Datasouth Computer Corp. v. Three Dimensional Techs., Inc., 719 F. Supp. 446, 450-51 (W.D.N.C. 1989)).

Republic Mortg. Ins. Co. v. Brightware, Inc., 35 F. Supp. 2d 482 (M.D.N.C. 1999). Here, those factors weigh in favor of transfer.

The first factor, plaintiffs' choice of forum, normally weighs heavily in the analysis. However, its weight is proportionate to the connection between the causes of action alleged and the chosen forum. Parham v. Weave Corp., 323 F. Supp. 2d 670 (M.D.N.C. 2004). As already explained, the connections between the claims in the

-16-

complaint and this District are tenuous. The heart of the parties'
dispute is the ownership of the MICROCYTE trademarks and its
outcome appears likely to turn on events that occurred in
Connecticut a number of years ago. LabCorp, the only North
Carolina entity in the case, is present mainly as a purchaser of
Dianon's interest in the marks. There is some connection between
North Carolina and the case because the MICROCYTE test has been
used and marketed here. Also, plaintiffs claim that defendants
engaged in unfair or deceptive trade practices in violation of
North Carolina law. Overall, there are some connections between
the claims and North Carolina, but they are weak. This is
particularly true when compared to their connections to
Connecticut. Therefore, plaintiffs' interest in choosing this
forum exists, but is significantly diminished.

In contrast to plaintiffs' choice of forum, the location of
witnesses and documents in the case weighs strongly in favor of
transfer. Three of the parties in the case are physically located
in Connecticut, while only one is located in North Carolina. More
importantly, the three parties in Connecticut are the ones that
claim to have been involved in the creation of the MICROCYTE marks.
Naturally, much of the documentary evidence in the case is likely
there. All of defendants' witnesses are located in Connecticut,
as are several of plaintiffs' employees or former employees who
worked with the original agreement between Dianon and defendants.
(Schumann Aff. ¶ 9)

-17-

In contrast, plaintiffs identify only a single witness, Nancy Moore, who is located in North Carolina. She currently supervises marketing materials related to the MICROCYTE marks. She does not appear to have any knowledge of the creation of the marks or the TSA, only of the marks' current use and marketing. (Moore Decl.) Plaintiffs also note that, because the marks have been used here, evidence of customer confusion could come from North Carolina. They have not pointed to any specific evidence of this type and it is unclear why this would not also be equally true of Connecticut or any other state where the marks were used.[10] Finally, plaintiffs state that several potential witnesses live in neither Connecticut nor North Carolina. (Pl. Brf. p. 17) This may be true, but it favors neither forum. Overall, the location of witnesses heavily favors Connecticut over North Carolina.

The next few factors play no real role in the transfer analysis of this case. No one has shown that it will be easier to obtain process over unwilling witnesses in one forum or another[11], that there will be any need for a jury view, that a judgment in

---

[10]Schumann's first affidavit actually states that defendants have not distributed their printed MICROCYTE materials in North Carolina. (Schumann Aff. ¶ 5)

[11]Defendants hypothesize that customers of the parties may be called to give evidence on likelihood of confusion. They argue that this favors Connecticut because defendants have no customers in North Carolina. However, given the number of MICROCYTE tests administered in North Carolina by plaintiffs, it is clear that plaintiffs do have customers here. This makes the factor neutral.

either venue would run into enforcement problems in the other[12], or that either location is more important to a fair trial. On the other hand, the apparent lack of personal jurisdiction over defendants in this District creates a great practical problem. Such difficulties have been held to favor transfer. <u>Datasouth Computer Corp. v. Three Dimensional Techs., Inc.</u>, 719 F. Supp. 446, 452-53 (W.D.N.C. 1989)(transfer appropriate to avoid substantial questions of personal jurisdiction); 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, <u>Federal Practice and Procedure</u> § 3854 (2d Ed. 1986).

Plaintiffs argue that the eighth factor in the analysis, relative congestion of the courts, favors transfer. They base this on statistics showing that there is a greater wait for a trial in Connecticut than in this District. As they point out, the average time from the filing of a civil case until trial was 32.4 months in Connecticut in 2005 and only 18 months here. (Pl. Brf. Exs. 1 & 2) Still, Connecticut is slightly ahead of this District when the time from filing to disposition (as opposed to only trial) is considered. That figure is 11.4 months in Connecticut and 12.6 months in this District. (<u>Id</u>.) Given the relative rarity of civil trials in the federal system, this factor does not weigh significantly in favor of keeping the case here.

---

[12]Where both potential fora are federal districts, this factor loses significance. <u>E'Cal Corp. v. Office Max, Inc.</u>, No. Civ. A. 01-3281, 2001 WL 1167534, at *4 (E.D. Pa. Sept. 07, 2001)(citing 17 James Wm. Moore, et al., <u>Moore's Federal Practice</u>, ¶ 111.13(1)(I) (3d. ed. 1997)).

-19-

The final factors also do not weigh heavily for or against transfer. Both North Carolina and Connecticut would have some interest in seeing the case decided given that the parties are located in both states, but the dispute between the parties is not really a "localized controversy." The case is also not a diversity case and there is no serious conflict of laws problem. Plaintiffs' unfair or deceptive trade practices claim is based on North Carolina law, but its outcome may well turn on the results of the federal law claims which are central to the case. In any event, the law controlling that claim is not so complex that either court would have difficulty with the case.

Overall, plaintiffs have chosen this forum and that choice carries some weight. However, plaintiffs' choice is diminished by the lack of connection between the facts of the case and this District, as well as the strong connections between Connecticut and those facts. On the other hand, it appears that Connecticut would be far more convenient for the great majority of the witnesses in the case. Also, jurisdictional problems in this District can be avoided through transfer. For all of these reasons, the case should be transferred to Connecticut.

**IT IS THEREFORE ORDERED** that plaintiffs' motion to supplement their response brief (docket no. 26) be, and the same hereby is, granted.

**IT IS RECOMMENDED** that defendants' motion to dismiss or, in the alternative, to transfer (docket no. 7) be granted to the

extent that it seeks transfer and that this case be transferred to the United States District Court for the District of Connecticut.


_____
**United States Magistrate Judge**

June 28, 2006